135 Nev., Advance Opinion 29

IN THE SUPREME COURT OF THE STATE OF NEVADA

LUIS ALEJANDRO MENENDEZ-
CORDERO,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 74901

**FILED**

JUL 25 2019

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of two counts of first-degree murder with the use of a deadly weapon. Second Judicial District Court, Washoe County; Connie J. Steinheimer, Judge.

*Affirmed.*

John L. Arrascada, Public Defender, and John Reese Petty, Chief Deputy Public Defender, Washoe County,
for Appellant.

Aaron D. Ford, Attorney General, Carson City; Christopher J. Hicks, District Attorney, and Marilee Cate, Deputy District Attorney, Washoe County,
for Respondent.

_____

BEFORE GIBBONS, C.J., PICKERING, HARDESTY, PARRAGUIRRE, STIGLICH, CADISH and SILVER, JJ.

*OPINION*

PER CURIAM:

In this appeal, we review appellant Luis Alejandro Menendez-Cordero's convictions for two counts of first-degree murder with a deadly

weapon. Menendez-Cordero presents two issues of first impression in Nevada. The first is whether the district court abused its discretion when it empaneled an anonymous jury by withholding the jurors' names and addresses from counsel. The second is whether the district court erred when it failed to instruct the jury on the effect of a deadly weapon enhancement at the penalty hearing.

Upon consideration of these and the remaining issue raised in this appeal, we adopt a framework for analyzing the appropriateness of juror anonymity and affirm the district court's judgment.

## BACKGROUND

In 2010, a group of friends gathered at an apartment in Sparks, Nevada. Appellant Menendez-Cordero arrived with Elder Rodriguez. Shortly thereafter, Kevin Melendez arrived and had a brief conversation with Menendez-Cordero and Rodriguez. After the group started playing cards, Menendez-Cordero and Rodriguez went outside. According to eyewitness testimony, Menendez-Cordero returned alone with a gun, shot Melendez and another guest, and fled the crime scene. Both victims died from the gunshot wounds.

While pursuing Menendez-Cordero, the State learned that Menendez-Cordero was a member of MS-13, a transnational gang. A confidential informant told the State that Menendez-Cordero admitted that he shot the victims because one of them had disrespected MS-13. The informant also explained that shortly after the shooting, Menendez-Cordero got a tattoo on his forehead, and that an MS-13 member will commonly get a gang-related tattoo after killing for the gang. Based on this and other evidence, the State charged Menendez-Cordero with two counts of first-degree murder with the use of a deadly weapon.

At a pretrial hearing, a special agent assigned to the Transnational Anti-Gang Unit of the Federal Bureau of Investigation testified about the violent nature of MS-13 and its growing presence in the United States. He informed the court about the role of hierarchy, respect, and tattoos within MS-13. Tattoos play an important role in MS-13 culture, he testified, and often signify the commission of a crime. The agent then identified multiple MS-13-related tattoos on Menendez-Cordero's body, including one across his forehead with the letters M and S and a pair of horns.

Before trial, the State also informed the district court about two recorded conversations wherein Menendez-Cordero asked his associates to threaten a key witness. The State sought to introduce the conversations as consciousness-of-guilt evidence at trial, which the district court ultimately permitted.

Having assessed the violent nature of MS-13, Menendez-Cordero's attempt to obstruct justice, and the lengthy prison sentence Menendez-Cordero faced if convicted, the district court decided to empanel an anonymous jury and redact the jurors' names and addresses from the juror questionnaires. The record indicates that the district court expressly explained its reasons for doing so to the parties before trial. The record also indicates that counsel retained access to the jurors' geographical locations, ages, professions, education levels, family demographics, and other biographical and personal information. Moreover, the district court apparently invited counsel to view the *un*redacted juror questionnaires of certain jurors the court flagged before formally starting jury selection.

Before questioning began, the district court informed all prospective jurors of its decision to identify them by number, not name, but explained that it was doing so to protect their privacy:

You may be questioning why are we using numbers instead of names. Well, some of you may have seen the newspaper yesterday. I don't know if it's in today. But as the judge here, I felt your privacy was important and I didn't want you being harassed or followed up during your time as jurors here. And so for that reason, I've selected this panel according to numbers. So you can rest assured that the newspaper reporters will leave you alone.

Extensive voir dire followed, which appears to have lasted a couple of hours. During this time, both parties had the opportunity to examine the panel of prospective jurors and ask a wide range of questions aimed at uncovering bias. Nothing in the record suggests that the district court limited the scope of questioning or rushed either party during this process. Instead, the only apparent limitation placed on voir dire was the redaction of the jurors' names and addresses.

After a ten-day trial, the empaneled jury found Menendez-Cordero guilty on both counts and further found that Menendez-Cordero had used a deadly weapon in the commission of the crimes. At the penalty hearing, the district court instructed the jury on the penalty for first-degree murder, the primary offense, and clarified that "[t]he sentence for the deadly weapon enhancement will be determined by the [c]ourt at a later date." It rejected Menendez-Cordero's request for a jury instruction that discussed the potential penalties associated with a deadly weapon enhancement, explaining that this question is not within the province of the jury. The jury then sentenced Menendez-Cordero to life without parole on each count, and the district court sentenced him to a consecutive term of 20 years' imprisonment for use of a deadly weapon on each count. This appeal followed.

## DISCUSSION

*Anonymous jury*

An anonymous jury is one in which certain biographical information is withheld from the parties and counsel.[1] Its propriety is an issue of first impression for this court.

We begin our analysis by observing that federal courts that have addressed this issue do not view anonymous juries as categorically impermissible. Instead, "every federal appeals court to have considered this issue has held that a district court's decision to empanel an anonymous jury is reviewed under a deferential abuse-of-discretion standard." *United States v. Dinkins*, 691 F.3d 358, 371 (4th Cir. 2012) (listing cases from the United States Courts of Appeal for the First, Second, Third, Fifth, Sixth, Seventh, Eighth, Ninth, Eleventh, and D.C. Circuits). Because of the fact-intensive nature of this determination, we too adopt an abuse-of-discretion standard and afford great deference to the district court's decision.

Yet we are mindful that juror anonymity may implicate a defendant's constitutional rights. By withholding certain biographical information, the district court denies a defendant information that may be helpful to strike biased jurors during voir dire, thereby threatening that defendant's Sixth Amendment right to an impartial jury. *United States v. Barnes*, 604 F.2d 121, 142 (2d Cir. 1979). By referring to jurors by number instead of name, the district court may imply that a defendant's dangerousness required juror anonymity, "thereby implicating defendants'

---

[1]Although "[t]he term 'anonymous jury' does not have one fixed meaning," *United States v. Dinkins*, 691 F.3d 358, 371 (4th Cir. 2012), both parties agree, as do we, that the district court's decision to withhold the jurors' names and addresses constituted an empanelment of an anonymous jury.

 

Fifth Amendment right to a presumption of innocence." *United States v. Shryock*, 342 F.3d 948, 971 (9th Cir. 2003).

We therefore emphasize that "empaneling an anonymous jury is an unusual measure," *id.*, and caution that a district court should employ such a measure only after careful consideration of the competing individual and institutional interests at stake. To aid district courts in striking this delicate balance, we adopt the following rule:

> [T]he trial court may empanel an anonymous jury where (1) there is a strong reason for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused.

*Id.* (internal quotation marks omitted).

In doing so, we decline Menendez-Cordero's invitation to apply the more demanding balancing test that we adopted in *Stephens Media, LLC v. Eighth Judicial District Court*, 125 Nev. 849, 862-63, 221 P.3d 1240, 1250 (2009).[2] In *Stephens Media*, we addressed whether the press has a First Amendment right to access juror questionnaires. In concluding that it does, we emphasized that jury selection is a public process, its openness

---

[2]We apply this more rigorous balancing test when the press's First Amendment right to access juror questionnaires threatens to infringe upon a defendant's Sixth Amendment right to a fair trial. It requires that a district court "(1) make[ ] specific findings, on the record, demonstrating that there is a substantial probability that the defendant would be deprived of a fair trial by the disclosure of the questionnaires and (2) consider[ ] whether alternatives to total suppression of the questionnaires would have protected the interest of the accused." *Stephens Media, LLC v. Eighth Judicial Dist. Court*, 125 Nev. 849, 863, 221 P.3d 1240, 1250 (2009) (internal quotation marks omitted).

deeply rooted in American jurisprudence and vital to the fair administration of criminal justice. 125 Nev. at 859-60, 221 P.3d at 1247-48. We simply do not believe that withholding identifying biographical information of jurors encumbers public access to a criminal trial in such a way that precludes the fair administration of justice.

Effective administration of justice, however, was not our sole concern. Underlying our holding was our recognition that the First Amendment was adopted primarily to "assur[e] freedom of communication on matters relating to the functioning of government." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980); *see also Stephens Media, LLC*, 125 Nev. at 859, 221 P.3d at 1247 (explaining the historical importance of the presumption of an open court). One cannot speak freely on government matters without access to information about our government institutions, which include the judicial branch. *Richmond Newspapers, Inc.*, 448 U.S. at 584 (Stevens, J., concurring). Ensuring public access to criminal proceedings is thus central to preserving the core purpose of the First Amendment.

We are unpersuaded that Menendez-Cordero's concerns are of the same constitutional dimension. His concerns are that when a district court withholds the names and addresses of potential jurors, it (1) interferes with a defendant's ability to exercise peremptory challenges, and (2) threatens to erode a defendant's presumption of innocence. As to his first concern, the use of a peremptory challenge to strike a biased juror is not a constitutionally guaranteed right. We instead view this practice as a statutorily conferred means to achieve the constitutional end of an impartial jury. *See* NRS 16.040, 175.051 (providing each party a specified number of peremptory challenges depending on the type of case and, if criminal, the offense); *see also Blake v. State*, 121 Nev. 779, 796, 121 P.3d

567, 578 (2005) (refusing to find a constitutional violation where the district court interfered with a defendant's use of peremptory challenges because such challenges "are a means to achieve the end of an impartial jury" (quoting *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988))). We have held before, and we affirm today, that interference with peremptory challenges does not necessarily amount to a constitutional violation; the defendant must also show actual prejudice. *See Blake*, 121 Nev. at 796, 121 P.3d at 578 (requiring the defendant to show "that any juror actually empaneled was unfair or biased"); *see also Summers v. State*, 102 Nev. 195, 199, 718 P.2d 676, 679 (1986) ("Absent a showing that the district court abused its discretion or that the defendant was prejudiced, we shall not disturb a district court's determination to conduct a collective voir dire of prospective jurors."). Menendez-Cordero has made no such showing.

As to his second concern, we recognize that a defendant's presumption of innocence "is a basic component of a fair trial." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). It does not follow that every courtroom procedure that threatens to erode this presumption is unconstitutional. *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (noting that the right to a fair trial "does not mean . . . that every practice tending to single out the accused from everyone else in the courtroom must be struck down"). Where the challenged courtroom practice is not inherently prejudicial, the United States Supreme Court cautions against presuming a constitutional violation without a showing of actual prejudice. *Id.* at 569. We believe that empaneling an anonymous jury is not inherently prejudicial because it does not necessarily imply guilt. *See id.* (concluding that using security officers in a courtroom during trial was not inherently prejudicial because it "need not be interpreted as a sign that [a defendant] is particularly dangerous or culpable"). Although an anonymous juror may attribute the need for

anonymity to the dangerousness of the defendant, it is equally possible that the juror will assume that the court merely intended to protect jurors from harassment, shield them from publicity, or streamline the jury selection process. In fact, an anonymous juror may infer nothing at all from anonymity, especially if the juror is unaware that this practice is unusual. In light of the variety of meanings jurors may assign to their anonymity, we refuse to presume that empanelment of an anonymous jury unconstitutionally brands a defendant with guilt, and instead we require that a defendant demonstrate actual prejudice. *See id.* at 569, 572.

We therefore conclude that empanelment of an anonymous jury does not, without actual prejudice, infringe on a defendant's constitutional rights. Moreover, Menendez-Cordero does not argue, and we cannot discern from the record, that the trial was otherwise closed to the general public. Absent any such evidence, we cannot conclude that this procedure was akin to that challenged in *Stephens Media*. We thus decline to extend our First Amendment precedent here and instead follow the lead of every federal circuit court that has addressed the issue of juror anonymity by adopting the two-part approach identified above. *United States v. Dinkins*, 691 F.3d 358, 372 (4th Cir. 2012) (citing cases that also adopt this framework from the United States Courts of Appeals for the Eleventh, First, and Seventh Circuits); *United States v. Lawson*, 535 F.3d 434, 439 (6th Cir. 2008); *United States v. Darden*, 70 F.3d 1507, 1532 (8th Cir. 1995) (citing cases that also adopt this framework from the Second and D.C. Circuits); *United States v. Krout*, 66 F.3d 1420, 1427 (5th Cir. 1995); *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir. 1988) (applying a similar balancing test). This approach, we believe, is accurately tailored to balance the constitutional concerns specific to juror anonymity.

*There was a strong reason justifying empaneling an anonymous jury*

Having adopted the appropriate approach to review a district court's decision to empanel an anonymous jury, we turn to the first part of the test: whether there is a strong reason to believe that the jury or fact-finding process needs protection. Factors bearing on this consideration include:

> (1) the defendants' involvement with organized crime; (2) the defendants' participation in a group with the capacity to harm jurors; (3) the defendants' past attempts to interfere with the judicial process or witnesses; (4) the potential that the defendants will suffer a lengthy incarceration if convicted; and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.

*United States v. Shryock*, 342 F.3d 948, 971 (9th Cir. 2003).

While we find this list instructive, we do not view it as exhaustive or dispositive. *Cf. United States v. Hager*, 721 F.3d 167, 187 (4th Cir. 2013) ("[T]he absence of any one factor . . . will not automatically compel a court not to empanel an anonymous jury."). Nonetheless, the district court here provided case-specific reasons justifying its decision to empanel an anonymous jury consistent with all five factors.

First, the district court found that Menendez-Cordero was involved with MS-13, a notoriously dangerous gang. A special agent's testimony about the violent nature of MS-13 and identification of MS-13 tattoos on Menendez-Cordero support this finding. *See Shryock*, 342 F.3d at 972 (holding that the first factor was met where the record showed that the defendant was involved with the Mexican Mafia, a similarly violent organization).

Second, the record demonstrates that MS-13 has the capacity to harm jurors. At a pretrial hearing, a special agent informed the court that MS-13 gang members routinely threaten witnesses with violence or even death. When asked to kill a key witness in this case, for example, Menendez-Cordero's associate said he would take care of it and ask another associate "what the process was last time." This evidence tends to prove that MS-13 regularly uses violence and intimidation to get what it wants, thereby jeopardizing the safety of those involved in the criminal proceeding. *See United States v. Prado*, No. 10-CR-74(JFB), 2011 WL 3472509, at *8 (E.D.N.Y. Aug. 5, 2011) (similarly concluding that "the members of MS-13 are willing and able to engage in violent criminal behavior").

Third, there is clear evidence that Menendez-Cordero interfered with the judicial process in this very proceeding. The State presented evidence that Menendez-Cordero called his associates while in pretrial detention and asked them to intimidate a key witness. *See United States v. Crockett*, 979 F.2d 1204, 1216 (7th Cir. 1992) (finding ample justification for an anonymous jury where, as here, a member of a violent criminal organization attempted to intimidate witnesses while in pretrial detention). Additionally, the record indicates that Menendez-Cordero provided court documents, including discovery materials, to active MS-13 gang members in Washoe County. There is also evidence in the record that shows Menendez-Cordero and an MS-13 affiliate discussed how to intimidate witnesses during trial. When viewed together, these attempts at interference justify the district court's concern.

Fourth, because Menendez-Cordero was charged with a double homicide and faced a lengthy prison sentence if convicted, he may have had an additional incentive to influence the outcome of the proceedings through intimidation or threats. *See United States v. DeLuca*, 137 F.3d 24, 32 (1st

SUPREME COURT
OF
NEVADA

(O) 1947A

11

Cir. 1998) (noting that lifetime sentences "surely provided a strong inducement to resort to extreme measures in any effort to influence the outcome of their trial").

Finally, a district court can reasonably expect that a double homicide committed by an alleged MS-13 gang member will receive extensive publicity, especially when the local newspaper published a front-page article about the trial and its connection to MS-13. *See United States v. Paccione*, 949 F.2d 1183, 1193 (2d Cir. 1991) (concluding that a case's "front-page news" status was sufficient to satisfy this factor).

Contrary to Menendez-Cordero's contentions, we believe these reasons are sufficiently tailored to the facts of this case. They are rooted in specific concerns about MS-13, as opposed to gang violence generally, and Menendez-Cordero's conduct in this very proceeding, as opposed to hypothetical risks. Accordingly, we conclude that there were strong, case-specific reasons to believe that the jurors and fact-finding process needed protection in this case.[3]

*The district court took reasonable precautions to ensure that juror anonymity did not infringe on Menendez-Cordero's fair trial rights*

We next consider whether the district court adopted reasonable safeguards to reduce the risk of infringing upon Menendez-Cordero's fair trial rights, which include the right to an impartial jury and the right to a presumption of innocence. Courts have held that a district court adequately protects a defendant's right to an impartial jury when it conducts a thorough voir dire designed to uncover bias. *See, e.g., United States v. Ross,*

---

[3]Although we list these reasons in the order in which the *Shryock* court addressed them, we reiterate that strict adherence to these factors is not required.

33 F.3d 1507, 1520 (11th Cir. 1994) (providing that the district court sufficiently protected a defendant's right to an unbiased jury where it conducted "voir dire that [could] uncover any bias toward issues in the case or to the defendant himself"); *Crockett*, 979 F.2d at 1216 (concluding that the district court took reasonable precautions to protect a defendant's right to an impartial jury where "voir dire was searching and thorough").

Additionally, courts have held that a defendant's presumption of innocence is untainted where the district court gives the jurors a "plausible and nonprejudicial reason for not disclosing their identities." *Paccione*, 949 F.2d at 1192; *see also Shryock*, 342 F.3d at 972-73 (holding that the district court took reasonable precautions when it instructed the jurors that anonymity was to "protect their privacy from curiosity-seekers" and assured them it was a common procedure); *United States v. Darden*, 70 F.3d 1507, 1533 (8th Cir. 1995) (holding that any danger that the jury might infer guilt is minimized where the district court explained to the jurors "that they were being identified by numbers rather than their names so that members of the media would not ask them questions"); *Crockett*, 979 F.2d at 1217 (upholding as reasonable the district court's explanation to the jurors that anonymity "was one of a number of procedures used by the federal courts to avoid any contact between the jurors and the parties"). We clarify, however, that although providing the jury with a plausible and nonprejudicial reason for anonymity is a sufficient precaution, it is not a necessary one in Nevada. A district court may determine that providing such instruction is not reasonably necessary to safeguard a defendant's rights, and decide not to provide the jury with any explanation as to their anonymity. These determinations will depend on the facts of the case. Therefore, absent an abuse of discretion, we will defer to the district court's

determination so long as its reasons for empaneling an anonymous jury appear in the record.

Guided by these holdings and principles, we conclude that the district court here implemented reasonable safeguards to minimize infringement on Menendez-Cordero's constitutional rights. Before jury selection, the district court instructed all potential jurors that it would be identifying them by number, not name, to protect them from public identification.[4] By attributing anonymity to privacy concerns, as opposed to Menendez-Cordero's affiliation with MS-13 and its propensity for violence, the district court minimized the risk that the jury would presume guilt before the trial had begun.

Furthermore, the district court redacted only the information necessary to protect the jurors' identities—names and addresses. Counsel retained access to the jurors' geographical locations, ages, professions, education levels, family demographics, and other biographical and personal information. Both parties thus engaged in a thorough voir dire of the prospective jurors and, despite not having access to the jurors' names and addresses, were equipped to formulate questions to uncover bias. The district court even invited counsel to view the unredacted questionnaires of certain jurors it flagged before formally starting the voir dire process to help the parties weed out potentially biased jurors and preserve their peremptory challenges. Although defense counsel declined this invitation,

---

[4]Menendez-Cordero argues that the district court never gave this instruction. The record plainly belies this argument, however. The district court gave this instruction on October 3, 2017, immediately before the parties began questioning all potential jurors during voir dire.

we believe that it evidences the district court's commitment to enabling counsel to strategically and effectively conduct voir dire.

We therefore hold that the district court did not abuse its discretion when it empaneled an anonymous jury and that its use satisfies both parts of the rule that we adopt today. We further conclude that Menendez-Cordero's remaining juror anonymity arguments are unavailing.[5]

*Jury instruction on Menendez-Cordero's deadly weapon enhancement*

The jury convicted Menendez-Cordero of first-degree murder. Pursuant to NRS 175.552, the trial jury was thus responsible for imposing the sentence for this charge at a separate penalty hearing. At the penalty hearing, the district court explained the various punishments for first-degree murder, the primary offense, and clarified that "[t]he sentence for the deadly weapon enhancement will be determined by the [c]ourt at a later date."

Menendez-Cordero argues that this was error because the district court did not adequately explain to the jurors the effect of a deadly weapon enhancement before they imposed Menendez-Cordero's sentence.

---

[5]Menendez-Cordero emphasizes throughout his appeal that the district court decided to empanel an anonymous jury sua sponte. Yet, he does not explain why this fact changes the analysis. We conclude that it does not because "no principle would distinguish an order to empanel an anonymous jury made sua sponte from one based on a party's motion." *Shryock*, 342 F.3d at 971.

We further note that Menendez-Cordero suffered no actual prejudice, a point he conceded during oral argument. Any alleged error would therefore be harmless. *See Wilkins v. State*, 96 Nev. 367, 371, 609 P.2d 309, 311 (1980) ("[A]bsent . . . a showing of prejudice, an irregularity in the selection of jurors, without more, must be deemed harmless error.").

He instead proposed an instruction including more detail on the practical effect of a deadly weapon enhancement on his sentence.

Whether a district court must instruct a jury on the effect of a deadly weapon enhancement at the penalty phase of trial is an issue of first impression in this court, yet we find no reason to treat it any differently than other jury instruction disputes.

That the district court has broad discretion in settling jury instructions is well established. *Crawford v. State*, 121 Nev. 744, 748, 121 P.3d 582, 585 (2005). Accordingly, we review such matters for abuse of discretion or judicial error. *Id.* "An abuse of discretion occurs if the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Id.* (internal quotation marks omitted). We discern no abuse of discretion here, and our rationale is twofold.

First, while we have consistently held that the defense is entitled to a jury instruction on its theory of the case, *Crawford*, 121 Nev. at 751, 121 P.3d at 586, we have never extended this holding to sentencing enhancements. Whereas determining the credibility of a defendant's theory of the case falls squarely within the jury's province, imposing a sentence enhancement does not. This is true even in cases where, as here, the same jury that determined a defendant's guilt is responsible for imposing a sentence pursuant to NRS 175.552. In such cases, NRS 175.552(1) expressly authorizes a jury to sentence a defendant upon finding the defendant guilty of first-degree murder. It does not authorize a jury to impose an additional penalty for sentencing enhancements. Nevada law instead assigns this task to the district court. NRS 193.165 (instructing the trial court, not the jury, on how to determine the length of the additional penalty imposed for a deadly weapon enhancement). We therefore find no justification, statutory or otherwise, for mandating that a district court

provide an instruction explaining the deadly weapon enhancement to the jury.

Second, the district court's decision was neither arbitrary nor capricious. After hearing arguments from both parties, the district court concluded that Menendez-Cordero's proposed jury instruction was an incomplete statement of the law that would confuse the jury. This is a sufficiently rational justification. *See Crawford*, 121 Nev. at 754, 121 P.3d at 589 (holding that a defendant is not entitled to jury instructions that are misleading or inaccurate).

Accordingly, we hold that a district court need not instruct a jury that is responsible for imposing a sentence in a first-degree murder case under NRS 175.552 about the effects of a deadly weapon enhancement. By holding that a district court has no statutory obligation to instruct a jury about the consequences of a deadly weapon enhancement, we by no means seek to prohibit a district court from issuing such an instruction. On the contrary, we encourage district courts to tailor jury instructions to the facts of each case.

*Admission of Menendez-Cordero's threats as consciousness-of-guilt evidence*

Menendez-Cordero argues that the district court erred when it admitted two recorded conversations during which he asked his associates to threaten a key witness. The State argued that these conversations were relevant to show consciousness of guilt and to disprove Menendez-Cordero's alibi that he was not in Nevada during the double homicide. After a pretrial hearing, the district court concluded that the evidence was relevant to show the identity of the shooter and more probative than prejudicial.

"A district court's decision to admit or exclude evidence rests within its sound discretion and will not be disturbed unless it is manifestly

wrong." *Libby v. State*, 115 Nev. 45, 52, 975 P.2d 833, 837 (1999). We discern no abuse of discretion here.

First, Menendez-Cordero argues that the district court erred by admitting this evidence because his threats never actualized. In Nevada, however, whether a threatening statement admitted to show consciousness of guilt reaches the intended party is of no consequence. *See Abram v. State*, 95 Nev. 352, 356-57, 594 P.2d 1143, 1145 (1979) (admitting a defendant's statement that he was "going to get to" a witness, although never communicated to the witness, because the statements "were clearly relevant to the question of guilt" (internal quotation marks omitted)).

Menendez-Cordero next argues that the district court erred because this evidence was not highly probative. We disagree and have previously held, "[e]vidence that after a crime a defendant threatened a witness with violence is directly relevant to the question of guilt." *Evans v. State*, 117 Nev. 609, 628, 28 P.3d 498, 512 (2001), *overruled on other grounds by Lisle v. State*, 131 Nev. 356, 366 n.5, 351 P.3d 725, 732 n.5 (2015). We therefore find it reasonable for the district court to conclude that Menendez-Cordero's attempt to threaten a witness was probative to show that he was conscious of his guilt and therefore wanted to silence eyewitness testimony. *See United States v. Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995) (providing that threats used to show consciousness of guilt are "second only to a confession in terms of probative value").

Finally, we are unpersuaded by Menendez-Cordero's characterization of this evidence as needlessly cumulative. The decision to exclude evidence as cumulative rests within the district court's discretion.

NRS 48.035(2); *Libby*, 115 Nev. at 52, 975 P.2d at 837. Here, the district court considered this evidence at a pretrial hearing and, after hearing from both parties, concluded that its probative value was not substantially outweighed by its cumulative nature. Nothing in the record suggests that this conclusion was manifestly wrong.

Having found no manifest abuse of discretion, we defer to the district court's decision to admit Menendez-Cordero's threats as consciousness-of-guilt evidence.[6]

For the foregoing reasons, we affirm Menendez-Cordero's judgment of conviction.

_____, C.J.
Gibbons

_____, J.          _____, J.
Pickering                                           Hardesty

_____, J.          _____, J.
Parraguirre                                        Stiglich

_____, J.          _____, J.
Cadish                                              Silver

---

[6]We decline to construe these threats as character evidence. *Evans v. State*, 117 Nev. 609, 628, 28 P.3d 498, 512 (2001), *overruled on other grounds by Lisle v. State*, 131 Nev. 356, 366 n.5, 351 P.3d 725, 732 n.5 (2015) (providing that evidence of a threat "is neither irrelevant character evidence nor evidence of collateral acts requiring a hearing before its admission"). Even if they were, the district court cautioned the jury against viewing the threats as propensity evidence. We believe that these instructions, absent any evidence that the jury was unable to follow them, were adequate to protect Menendez-Cordero against unwarranted presumptions.